IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| SOVERAIN SOFTWARE LLC, | § | |
| | § | Hon. Leonard E. Davis |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 6-04CV14 |
| | § | |
| (1) AMAZON.COM, INC., and | § | |
| (2) THE GAP, INC., | § | JURY TRIAL DEMANDED |
| | § | |
| Defendants. | § | |

**AMAZON.COM'S MOTION TO STRIKE EXPERT REPORTS
OF PETER MARTIN AND PRECLUDE HIS TESTIMONY**

Amazon.com, Inc. ("Amazon.com") moves to strike the expert reports of Mr. Peter Martin and preclude his testimony because he has demonstrated a lack of expertise and knowledge and he has failed to use reliable methodologies, and thus his testimony will not assist the trier of fact.

**I.   INTRODUCTION**

On May 9th, 2005, Mr. Peter Martin submitted his *Expert Report of Peter Martin: Rebuttal to Reconstruction Report by Justin Erenkrantz of April 11, 2005.* (See Tesnakis Decl., Exh. A, "Martin Rep."). On the day he was deposed, May 26th, 2005, Mr. Martin submitted a Supplemental Expert Report (See Tesnakis Decl., Exh. B, "Martin Supp. Rep.").[1] Mr. Martin was asked by Soverain to rebut Amazon.com's reconstruction of the Hot Hot Hot and Condom Country websites, and he concluded that the reconstructions are unreliable because of variances in some of the "last modified dates" of some of the files. Mr. Martin's reports should be stricken because:

---

[1] See Tesnakis Decl., Exh. C, Deposition of Peter Martin ("*Martin Dep.*") 304:23-305:7.

- he did not use a reliable methodology in formulating his opinions;
  - He did not use a common software tool, "*diff*", that provides an accurate comparison of the contents of two files, prior to preparing his report.
  - Instead, he relied on the "last modified date" which only "suggests" that a file may have been altered, but provides no evidence of actual alteration.
  - He now acknowledges that the key files that were actually used in the reconstruction are identical to the original files.
- he does not possess expertise with the relevant technologies;
  - He has never designed a webserver.
  - He has never reconstructed a website.
  - He has no real programming experience with a web server.
  - He has no significant experience with the underlying technologies of the reconstructed websites.
- he lost or destroyed his notes regarding his investigation;
- he failed to consider other reasons that would invalidate his opinions; and
- he ignored or discounted relevant evidence that would invalidate his opinions.

Near the end of his deposition, after being questioned on these and other topics, Mr. Martin stated, "I may go back and reexamine what I found to establish that what looked like a discrepancy has a perfectly reasonable explanation, and that may diminish my findings as having much significance." Tesnakis Decl., Exh. C, Deposition of Peter Martin, *Martin Dep.*, 304:23-305:7. Accordingly, his testimony would not assist the trier of fact on any issue in the case and he should be precluded from offering expert testimony.

## II.  **LEGAL STANDARD**

Expert testimony is admissible pursuant to the Federal Rules of Evidence, primarily Rule 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Under *Daubert*, the district court acts as a "gatekeeper," excluding "junk science" that does not meet the standards of reliability required under Rule 702. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). The trial court accomplishes this goal through a preliminary determination that the proffered evidence is both relevant and reliable. *Daubert*, 509 U.S. at 589-95. The proponent of the expert testimony must prove that the expert is "qualified to testify competently regarding the matters he intend[ed] to address; [] the methodology by which the expert reache[ed] his

conclusions is sufficiently reliable; and [] the testimony assists the trier of fact." *Maiz v. Virani*, 253 F.3d 641, 664 (11th Cir. 2001). The proponent must prove that the testimony is reliable by a preponderance of the evidence. *See Tanner v. Westbrook*, 174 F.3d 542, 547 (5th Cir. 1999).

Methodological flaws in a proffered expert's analysis are grounds for exclusion of his opinions. *See Rodriguez v. Bexar County, Tex.*, 385 F.3d 853, 862 (5th Cir. 2004). In *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253 (11th Cir. 2002), the court excluded an engineering expert's testimony because he did not test alternative designs, did not talk to witnesses, cited no supporting literature, and did not test for extrinsic causes that would undermine his conclusions.[2] *See McCorvey*, 298 F.3d at 1256-1257.

## III. DISCUSSION

Mr. Martin's report is styled as a rebuttal to the Reconstruction Report of Mr. Justin Erenkrantz. Mr. Erenkrantz reconstituted the Condom Country ("CC") and Hot Hot Hot ("H3") websites as they existed in August and September 1994 from the original files (which were obtained from the original designer/programmers) and conducted specific tests on portions of the web server code and access logs preserved in the H3 backup materials.

As is detailed below, Mr. Martin's analysis was seriously flawed, and his resulting opinions cannot assist the trier of fact.

### A. Mr. Martin did not use a Reliable Methodology as Required by Daubert

Mr. Martin's analysis and opinions are based on "last modified" dates, not analysis of the content of the source files. *Id.*, 209:15-212:4. He claims that because some of the files that he

---

[2] Here, Mr. Martin did not attempt to recreate and test the websites from the source materials (or Mr. Erenkrantz's backup of his reconstruction), he did not contact any of the three H3 witnesses or Mr. Ramstad (all of whom are third parties), he cited no professional literature to support his view that "last modified" dates are an accurate way to determine authenticity, and he did not consider the actual extrinsic causes for what he considered to be anachronisms that resulted from intentional manipulations. As explained below, each extrinsic cause appeared to be beyond Mr. Martin's knowledge and experience.

examined have "recent" dates their authenticity is questionable. However, it is indisputable that two files can have dates that are years apart and yet to be identical in all other aspects.[3] Indeed, after prompting, Mr. Martin conceded that he was aware of Unix commands that can alter dates without altering the contents of the file, such as *touch*. *Id.*, 106:24-107:8.

Martin also admitted to being aware of the Unix *diff* command. *Id.*, 176:12-177:4. The *diff* command in UNIX operating systems allows any user knowledgeable in UNIX operating systems to compare the contents of different files. Martin was aware that using it could refute his opinions. *Id.*, 212:11-213:4.

In preparation for his first report, however, Mr. Martin failed to use *diff* to determine accurately if any alterations had been made to any source or object file used by Mr. Erenkrantz in the reconstruction.[4] After the Erenkrantz deposition, when Mr. Martin used *diff* to compare the H3 and CC original source files with the files actually used in the reconstructions, he found no material difference.[5] Mr. Martin ignored the most reliable source of information available, a source that could confirm or refute his opinions, and instead reported opinions based on alleged "anachronisms" in the "last modified" dates of certain files. In short, Mr. Martin resorted to "junk science" instead of a reliable methodology to assert that unexplained manipulations had occurred. Either Martin knew about *diff* before the report and intentionally chose not to use it to compare the source files, or he forgot about *diff* and used another, unreliable method to compare

---

[3] Other reasons why Mr. Martin's reliance on the "last modified" date is unreliable are discussed later.
[4] Or he failed to report that he did use such a utility and that no changes were detected. Mr. Martin's testimony is inconsistent on whether he used the diff tool prior to issuing his first report or after, and to the number of files that he examined using it. Apparently, he did not log his analysis activities or he lost or destroyed his notes. *Martin Dep.* 161:17-162:21
[5] Additionally, Mr. Martin admitted they the "key" files used in the reconstruction of the H3 website all had a "last modified" date of 9-30-1994 or earlier. *Id.,* 303:11-25. In other words, *even if Martin used a correct methodology, his own report admits that the H3 reconstruction is accurate.*

the differences in the source files. In any event, his knowledge of *diff* **and his acknowledgement that there were no differences between the reconstruction code and the original code** is also a concession that the "last modified" date is not a reliable basis on which to determine if there are changes between two copies of a file.

Martin also could have used RCS to examine the Condom Country source code. But because he did not know how to use RCS (or because he forgot), he did not do so before his report, or at least such an analysis never appeared in his report. *Id.*, 243:21-244:11. At his deposition, he admitted that after his report, he used RCS to examine the CC source files.[6] He found that the files he examined on the original source files and the reconstruction source files "were identical." *Id.*, 238:17-240:21.

### B. Mr. Martin Does not Possess any Particular Expertise Regarding the Subject Matter of the Reconstruction

By his own admission, Mr. Martin never attempted to reconstruct the websites or attempted to follow Mr. Erenkrantz's methodology to determine its accuracy. *Martin Dep.*, 143:18-20; 144:12-17. The ability to reconstruct websites, and indeed the ability to examine the methodology used to reconstruct websites is outside Mr. Martin's expertise.

#### 1. Mr. Martin Lacks Expertise in the Primary Subject of Web Server Design and Programming

The primary subject of Mr. Erenkrantz's report is the reconstruction of web servers that support the H3 and CC websites. On this key point, Mr. Martin admits his lack of expertise in web server design and reconstruction experience: "I've written no web servers in the past 15 years." *Id.*, 91:25-92:1. "Q: Have you ever done a reconstruction before? A: No." *Id.*, 106:2-5. Also, Mr. Martin admits that he has no real experience in web server programming. Mr.

---

[6] In particular, he stated that he had only used RCS in the week prior to his deposition on May 26th, whereas his initial report was served on May 9th, 2005. Martin Dep. at 235:17-236:7.

Martin's web server "programming experience" is little more than running the installation program for Apache.[7] "I said the programming that I have done is to configure the Apache web server which comes built for me to run on my computer. So I don't program." *Id.*, 93:11-18. Indeed, between November 1993 (when HTML forms was introduced) and 2001 (his last recorded position before engaging in legal support), Mr. Martin's primary duties were managerial, as detailed in the chart below:

| Relevant dates | Employer | Time spent programming | *Martin Dep.* |
|---|---|---|---|
| Nov 1993 – 1996 | Taligent | 40% | 90:25 to 91:8 |
| 1996-1997 | Verity | 5-10% | 90:25 to 91:8; 76:16 to 76:24 |
| 1997-1999 | Visa | 5% | 81:2 to 81:6 |
| 1999-2000 | Ratestream.com | 15% | 82:3 to 82:17 |
| 2000-2001 | KnowledgeFirst | 0% | 85:6 to 86:19 |
| 2001 (three months) | Metilinx | 0% | 85:20 to 86:10 |

    **2.**   **Mr. Martin Lacks Experience With any of the Principal Technologies Involved in the Reconstruction Including the SunOS 4.1 Operating System, NCSA httpd v1.3, the Common Gateway Interface, the Oracle <u>Database Management System, or the Revision Control System</u>**

Both the H3 and CC websites were originally developed on the SunOS v4.1 operating systems,[8] based on the NCSA httpd version 1.3 (also referred to at times simply as httpd),[9]

---

[7] By comparison, millions of Americans install tax preparation software on their home computers every year. This process may require that the user provide configuration parameters, such as the directory where to install the software. As should be apparent, software installation does not make the consumer an expert on the development or design of tax preparation software.

[8] There are many different operating systems developed by many different companies. Within the specific systems developed by a single company, every version of an operating system bearing a single trade name (e.g., MS Windows®) has its own unique set of capabilities and flaws. SunOS is a variant of the Unix operating system developed by Sun Microsystems of California to run on computer hardware developed by Sun.

[9] NCSA is the National Center for Supercomputing Applications at the University of Illinois. NCSA programmers developed web server (httpd) and web browser (Mosaic) software with matched sets of features during 1993 and 1994. These programmers later went on to form Netscape Communications. When they did, an independent group formed the Apache

incorporating CGI programming extensions.[10] Additionally, the development of the CC website was maintained through RCS[11] and heavily dependent on the Oracle DBMS[12] for maintaining the product databases, user profile information, and purchase information. Mr. Martin has demonstrated a lack of expertise with and knowledge with these systems.

Mr. Martin's stated experience with a Sun operating system extends only to being a user at Verity where no more than 10% of his time was spent programming, and even this programming was unrelated to the Sun OS or WWW. *Id.*, 96:8-22. When pressed, he had no knowledge that SunOS was a POSIX compliant operating system,[13] how the "last modified" date was actually updated in the Sun OS, or how httpd managed open and closing its log files. *Id.*, 193:7-9; 188:5-8; and 196:8-13. He has "no significant experience" with Oracle. *Id.*, 98:2-7. He could not state with authority that he had ever used RCS in his work; was unaware of how the "last modified" date of an RCS archive is changed when a version is locked upon check out; and was unaware that RCS sets the Unix access permissions of the checked out file. *Id.*, 111:20-24; 286:9-19; and 291:2-4. At best, he has only "a general idea" of how RCS works. *Id.*, 112:11-20.

---

Foundation, which used the NCSA httpd code base as the basis for the Apache web server, which today accounts for approximately 65% of webservers that are in operation world-wide.
    On January 24, 1994, NCSA released httpd version 1.1, which incorporated support for HTML forms, PGP encrypted communications, and a sample application for ordering sandwiches via the Internet. In May 1994, NCSA released version 1.3 of the httpd web server software. Condom Country, Hot Hot Hot, Stuff.com, and NetMarket were all built on the version 1.3 code base.

[10] CGI stands for the Common Gateway Interface, which defines how a web server can receive query information as part of an HTTP request.

[11] RCS stands for "Revision Control System." RCS was a software package developed to track changes in source code during software development. An RCS archive records the changes that have been made between the file that is being checked in and the previous version of the file. Using RCS, the source code as it existed on any particular date can be extracted from an RCS archive.

[12] Oracle is one of the major suppliers of relational database technology.

[13] POSIX was an effort to standardize the operation and interfaces of various Unix operating systems that had been developed by scores of different manufacturers. A manufacturer that adopted the POSIX-standard was said to be POSIX-compliant.

Indeed, Mr. Martin did not know what "RCS" stands for – a concession demonstrating his utter lack of familiarity with this system since every person with any experience using RCS, and indeed many people who do not commonly use RCS, would know what "RCS" means. *Id.*, 112:17-112:20.

### 3. Reading a Couple of Books and Setting up a Website Does Not Qualify Martin as an Expert

Mr. Martin's resume lists no publications, academic training, or work experience that establish his expertise with the above technologies. His testimony as to his belief in his own abilities is based on reading one or two books on the subject and "setting up a website." *Id.*, 21:6-24:6.

In sharp contrast, Mr. Erenkrantz has the necessary qualifications. *Id.*, 94:9-16. Mr. Erenkrantz is a Board Member of the Apache Foundation and possesses the highest authority to introduce changes into the Apache web server source code -- the code used for 65% of web servers in the world.[14] *See supra* note 6. Mr. Erenkrantz also has demonstrated proficiency with all of the above technologies. Mr. Martin does not criticize any of the techniques used by Mr. Erenkrantz. Instead, he simply asserts that Mr. Erenkrantz should have used care to prevent the dates on some of the files from changing. But as demonstrated below, such a critique underscores Mr. Martin's lack of qualifications as an expert because no person knowledgeable in the field would base an opinion about the accuracy of a reconstruction by looking only at the last modified dates of source files.

---

[14] Membership in the Apache Foundation is merit based and by invitation only. Last month, Mr. Erenkrantz was elected to the board of directors of the Apache Foundation.

### C. Mr. Martin Failed to Examine Extrinsic Causes for his Asserted Discrepancies

By his own admission, Mr. Martin failed to consider other reasons for what he perceived as "failures" of Mr. Erenkrantz to preserve the original "last modified" dates. However, after being challenged at his deposition with the likely explanations for each of his alleged anachronisms, he was forced to admit that he would have to re-evaluate his opinions in light of what appeared to be perfectly acceptable explanations:

> For the most part, they seemed to be identical. I -- as a result of what's happened today, I've realized some explanations for what I thought were discrepancies, and I may go back and reexamine what I found to establish that what looked like a discrepancy has a perfectly reasonable explanation, and that may diminish my findings as having much significance. *Id.,* 304:23-305:7

In particular, Mr. Martin failed to appreciate:

1. The proper operation and usage of the Revision Control System;
2. How Sun OS 4.1 handled the update of the "last modified" field during late 1994;
3. How different operating systems – notably Macintosh and Windows® – offset for Greenwich Meant Time ("GMT").

### 1. The Proper Operation and Usage of the Revision Control System

To obtain a historic version of a source file from an RCS archive, the checkout command ("co") is used. When this is done, RCS sets the Unix file access permissions to "read only" to prevent accidental changes from being made. As documented in the RCS instruction manual (which Mr. Martin looked at for the first time after his report and after Mr. Erenkrantz's deposition where he explained RCS), if the programmer wants to make changes to the file, then a specific option is used which places a lock on the RCS archive. When an RCS archive is locked, its last modified date will be updated to match the time that the lock was applied. In Mr. Erenkrantz's report, he referred to specific files that needed to be checked out of the archive so that they could be modified, particularly those related to configuring the CC website to run on his computer. And because RCS keeps an archive of any and all changes to the source code, Mr.

Martin could readily determine exactly how the source code looked immediately before Mr. Erenkrantz examined the code. Yet he did not do so.

### 2. How Sun OS 4.1 Handled the Update of the "Last Modified" Field During Late 1994

Mr. Martin opined that anachronisms in the "last modified" dates of the H3 access_log and httpd_state_archive files "suggest manipulation" of those dates.[15] *Martin Rep.* ¶¶ 22, 38. Mr. Martin's lack of expertise with SunOS 4.1 meant that he was unaware that during late 1994, it was known that updates to the "last modified" field of a file were not performed immediately, but were deferred to a future event. *Martin Dep.*, 193:7-9; 188:5-8. He further demonstrated a lack of familiarity with how httpd actually manages the opening and closing of the access_log. *Id.*, 196:8-13.

Mr. Martin simply does not possess the expertise to evaluate this condition, and he did not take it into account in formulating his opinions.

### 3. Treatment of Date/Time Fields by Various Operating Systems

Mr. Martin was completely unaware of differences in the way that Macintosh computers and DOS-based systems like Microsoft Windows® handle offsets to Greenwich Mean Time ("GMT"). *Id.*, 224:3-225:5. In fact, when challenged by this, he stated that he was unaware that a Macintosh had been used. *Id.*, 283:17-25.[16] Accordingly, he did not take into account the fact that he was viewing materials which had a time offset. He was forced to admit that the five-hour discrepancy in last-modified dates between the original source code and Mr. Erenkrantz's source code reflected nothing more than the fact that one computer used a Macintosh and one computer used Windows®.

---

[15] It is hardly coincidental that the last entries contained in those files are dated on November 17, 1994, which is the date that the backup tape was made.
[16] *Id.*, 243:21-244:11.

### D. Mr. Martin did not Keep a Logbook and Destroyed or Lost Whatever Notes he Created

Unlike Mr. Erenkrantz, who maintained and preserved a logbook regarding the process of his analysis of the H3 and CC source materials and subsequent reconstruction, Mr. Martin readily admits to having destroyed (or lost) whatever notes he made during his analysis. *Martin Dep.*, 161:17-162:21. Since Mr. Martin ostensibly is being called by Soverain to testify regarding sound engineering practices, he should have followed the same standard engineering practice that Mr. Erenkrantz did – keep a logbook of his activities and record all findings whether good or bad. However, having destroyed (or lost) his notes, all documentary evidence that would undermine the opinions expressed in his expert report, such as the identification of all the files that he verified were unaltered whether by using the *diff* command.

### E. Mr. Martin Discounted Testimony and Evidence of the Designers of the H3 and Condom Country Websites Without any Apparent Cause

Mr. Martin testified that he could not confirm the authenticity of either the H3 or CC websites because to his knowledge, no contemporaneous evidence of what those websites looked like existed. *Id.*, 164:22-165:11. In doing so, Mr. Martin overlooked the testimony of Michael Kuniavsky, who produced and confirmed the authenticity of several H3 screen shots that he made (one in September 22, 1994). *See* Tesnakis Decl., Exh. D, "*Kuniavsky Dep.*," 74:7-75:11 and Tesnakis Decl., Exh. H and I, Kunivasky Exhs. 11 and 18, respectively. Mr. Martin further ignored extensive description and depictions of the H3 website contained in Lynda Weinman's book, Deconstructing Web Graphics, which was researched in 1995 and published in 1996. Tesnakis Decl., Exh. E, Kunivasky Dep., Ex 17. Mr. Martin also dismissed the testimony of Mr. Thomas Soulanille, founder of Altadena Instruments who was also principally involved in the H3 website development. *See* Tesnakis Decl., Exh. F, Deposition of Thomas Soulanille, ("*Soulanille Dep.*"), 66:6-67:10; *Martin Dep.* 167:5-168:23, Mr. Martin further ignored the testimony of

Robert Ramstad, founder and one of the principal programmers of the Condom Country website, and an MIT graduate. *Martin Dep.* 167:5-168:23. Mr. Ramstad testified that he personally archived the CC system in 1994 and 1995 on backup tapes, that he has been in continuous possession of the backup tapes, that he extracted the data from the backup tapes, and that he provided the CC source code as it was stored in RCS format in the file access_group.tar. *See* Tesnakis Decl, Exh. G, Deposition of Robert M. Ramstad ("*Ramstad Dep.*"), 51:11-53:13; 232:2-233:15; 66:23-68:20. Mr. Ramstad reviewed video files of interactions with the CC reconstruction testified to their authenticity. *Ramstad Dep.*, 126:23-129:4.

Mr. Martin was unable to identify any substantive change in the H3 and CC web server code, yet he nevertheless gave the above evidence no weight. *Martin Dep.*, 169:21-170:8.

To summarize, even though Mr. Ramstad maintained nearly every file that supported the CC website under the Revision Control System, with the except of product images which Mr. Martin agreed would be unsuitable to be under RCS, even though Mr. Ramstad personally held and produced the source materials; even though Mr. Martin's investigation found reconstruction versions to be identical to what came off access_group.tar archive, and even though Mr. Ramstad has seen and confirmed specific details of the website that could not have been known to Mr. Erenkrantz, Mr. Martin provided no tenable basis for his opinion that the websites are not accurate.

### F. Mr. Martin Failed to Appreciate the Usage of Macintosh Computers

Mr. Martin based some of his opinions on the use of Macintosh computers or Macintosh based browsers. In ¶¶ 31 and 39, he asserts that the use of Macintosh-based browsers was inappropriate. In so doing, he ignored the evidence contained in the http_alta_state archive. This file clearly indicates that Macintosh-based browsers were used to access the H3 website. He further states that the websites required "server side tailoring" of the HTML pages for

specific browsers to operately correct.[17] *Martin Rep.*, ¶ 31. In deposition, he admitted that the CC system did not provide such tailoring. *Martin Dep.*, 261:21-23.

He also stated that because Macintosh computers were not "heavily used in 1994" that this would not be "relevant for the majority of accesses." This statement is misleading for several reasons. First, it is admitted by Mr. Martin (and confirmed by Mssrs. Soulanille and Ramstad) that browsers don't impact how the server functions. *Martin Dep.* 251:10-19. If different browsers are compliant with the HTML specification, then users will have the same experience with some cosmetic variations.[18] *Soulanille Dep.* 68:11-20, 157:19-160:10; *Ramstad Dep.* 129:20-130:9,138:20-139:18. Second, and perhaps, most importantly, Mr. Martin ignored the fact that a Macintosh-based browser was the fourth most common browser used to access the H3 website between September and November 1994! *Martin Dep.* 257:7-16.

Finally, Mr. Martin expressed doubt that a window from NCSA Mosaic 2.4 for X-Windows® running on a Sun computer (vintage 1994) could appear or be captured on a Macintosh running a modern operating system (vintage 2005). *Martin Dep.* at 279:4-7. In fact, it is a fundamental feature of X-Windows® that the contents of a window can be displayed by another computer on the local network that is also running X-Windows®, such at the Macintosh OS. His failure to know this basic fact regarding Mosaic for X is further evidence of his lack of expertise.

---

[17] Perhaps, more accurately called "customizing the documents being server based upon a user profile" such as the type of browser being used. See '780 Patent, claim 26.
[18] For example, the default background color might be grey or white. Fonts, font sizes, buttons, and menus may be drawn differently, but they function the same way.

G.   **Mr. Martin Failed to Appreciate the
     Usage of a Proxy Server in the Reconstruction**

In ¶ 32, Mr. Martin asserts a number of tests should have been demonstrated.[19] One thing in particular stands out-Mr. Martin asserts that a common gateway should have been placed between the client and server systems in the Erenkrantz reconstruction. In fact, there was a proxy server between the H3/CC client and server systems at all times, but he failed to recognize this both at the website inspection of April 22nd, and as described in Mr. Erenkrantz's report.

H.   **Mr. Martin Actually Agrees With Mr. Erenkrantz Conclusions**

In the absence of Mr. Martin's untenable theories about "last modified" dates, he ultimately agrees with Mr. Erenkrantz's analysis of the H3 access log:

```
 9   Q.  Okay.  Assume that the access log is real
10   and is authentic.
11       Do you agree with the description in
12   Mr. Erenkrantz' report?
13       MR. BROWN:  Object to the form.
14       THE WITNESS:  Under those limiting
15   assumptions which I do not agree, I would, were they
16   to be so, agree with Mr. Erenkrantz' description.  (Martin Depo., 142:9-16)
```

Mr. Martin later agreed that the H3 access logs were probably authentic, based in part on an e-mail sent by Andrew Payne describing the H3 site five minutes after the access logs indicate that his computer was used to access H3. *Martin Dep.* 296:11-299:22. Mr. Martin also agrees that employees of Open Market were trying to probe the capabilities of the H3 website, and particularly that Mr. Payne exhibited curiosity in his interaction with H3. *Martin Dep.* 324:5-326:16; 312:25-313:12.

---

[19] There is no legal or factual basis for this assertion. According to *Sperberg*, the opposing party may not force the performance of any particular testing on a system, nor may he gain evidentiary advantage by asserting that such tests were not performed. *Sperberg v. Firestone Tire & Rubber Co.*, 61 F.R.D. 80, 83 (N.D.1973). Rather, he is entitled to construct his own apparatus and enter the results of his own tests. Suitable hardware could be obtained from Ebay quite cheaply. Moreover, Soverain was provided with a complete copy of the server system on April 27th after they failed to attend a second inspection that was scheduled at their insistence.

Of the specific files that Mr. Erenkrantz actually used to construct the H3 webserver (contained in alta.tar), Mr. Martin described the archive as being "self consistent" in his report. Martin Rep., ¶ 23; *Martin Dep.*, 212:5-213:4. In fact, his conclusions regarding the "suspicious dates" of the H3 files were in need of change, in light of the "mechanical" factors that he had not considered. *Martin Dep.*, 281:19-284:13. And as previously discussed, in his supplemental report, Mr. Martin agreed that all the "key" files for the H3 website had a last-modified date of September 30, 1994 or before.

## IV. CONCLUSION

Mr. Martin should not be permitted to testify as an expert witness in this case because by his own admission he has no expertise in the field of website reconstruction, his deposition testimony demonstrates a remarkable lack of understanding of applicable technology. He used no methodology, let along any reliable methodology to reach his conclusion, and he ignored the evidence available to him in formulating his opinion and conclusion. In short, his conclusion is based on nothing more than unsupported speculation – the very type of "expert" testimony that Daubert requires the court to exclude in exercising its gatekeeping function.

Dated this 10th day of June, 2005.

Respectfully submitted,

By: /s/ Richard Mc Leod
Max L. Tribble (attorney in charge)
TX Bar No. 20213950
mtribble@susmangodfrey.com
Victoria Capitaine, TX Bar No. 24031912
vcapitaine@susmangodfrey.com
SUSMAN GODFREY, L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666

Parker C. Folse, III, WA Bar No. 24895
pfolse@susmangodfrey.com
Brooke A.M. Taylor, WA Bar No. 33190
btaylor@susmangodfrey.com
SUSMAN GODFREY, L.L.P.
1201 Third Avenue, Suite 3100
Seattle, Washington 98101-3000
Telephone: (206) 516-3880
Fax: (206) 516-3883

J. Christopher Carraway, OR Bar No. 96172
christopher.carraway@klarquist.com
Richard D. Mc Leod, TX Bar No. 24026836
rick.mcleod@klarquist.com
John D. Vandenberg, OR Bar No. 89375
john.vandenberg@klarquist.com
KLARQUIST SPARKMAN, LLP
121 S.W. Salmon Street, Suite 1600
Portland, Oregon 97204
Telephone: (503) 595-5300
Fax: (503) 595-5301

OF COUNSEL:

David A. Zapolsky, WA Bar No. 22451
davidz@amazon.com
Vice President and Associate General Counsel
Amazon.com, Inc.
P.O. Box 81226
Seattle, WA 98101-1226
Telephone: (206) 266-1323
Fax: (206) 266-7010

***Attorneys for Defendant Amazon.com, Inc.***

## PROOF OF SERVICE

The undersigned certifies that on the 10th day of June, 2005, the foregoing pleading was electronically filed with the Court. Pursuant to Local Rule CV-5, this constitutes service on the following counsel:

| | |
|---|---|
| Carl Roth | cr@rothfirm.com |
| Thomas L. Giannetti | tlgiannetti@jonesday.com |
| Kenneth Adamo | kradamo@jonesday.com |
| Michael C. Smith | ms@rothfirm.com |
| Jennifer Seraphine | jseraphine@jonesday.com |
| Kenneth L. Stein | klstein@jonesday.com |
| Ognjan V. Shentov | ovshentov@jonesday.com |
| Richard H. An | rhan@jonesday.com |

**Attorneys for Plaintiff Soverain Software, LLC**

/s/ Richard Mc Leod
Richard Mc Leod