# EXHIBIT 3

**Excerpted Transcript Pages
from Vol. II, February 2, 2005 Deposition
of Daniel M. Kohn, taken by Defendant**

```
 1              UNITED STATES DISTRICT COURT
 2               EASTERN DISTRICT OF TEXAS
 3                      TYLER DIVISION
 4
 5   SOVERAIN SOFTWARE, LLC,      )
 6                  Plaintiff,    )
 7        vs.                     )    NO. 6:04-CV-14
 8   (1) AMAZON.COM, INC.         )       04-CV-528
 9   (2) THE GAP, INC.            )
10                  Defendants.   )    VOLUME II
11   _____  )
12
13
14
15       CONTINUED DEPOSITION OF DANIEL M. KOHN
16              WEDNESDAY, FEBRUARY 2, 2005
17    PURSUANT TO SUBPOENA BY THE DEFENDANT AMAZON.COM
18
19
20
21
22
23
24
25   PAGES 24 - 175
```



475 Sansome Street, Suite 540
San Francisco, CA 94111
Phone: 800-219-5300
Fax: 415-362-0907
sfdepos@eastwood-stein.com

```
 1   '93, that X Mosaic was released when it became clear
 2   that a Telnet-based interface was not going to be the
 3   best way of communicating and selling over the
 4   Internet, but instead, a web-based transaction was
 5   going to be the best way.                              09:10:13
 6        Q.  At the time when X Mosaic was released,
 7   had any work been done on the Telnet version of the
 8   site?  Any software development work?
 9        A.  I believe it had, but I'm not certain.
10        Q.  Okay.  I'll hand you what's been marked as    09:10:27
11   Exhibit 15.
12        A.  Thank you.
13        Q.  I'll ask you to just look this document
14   over and tell me -- let me know when you've had a
15   chance to look it over.                                09:10:50
16        A.  Yes, I have.
17        Q.  Can you identify Exhibit 15 for us?
18        A.  I can.  This is a copy of the business
19   plan that we sent to Craig Adams, the president of
20   Noteworthy Music, in January of 1994, to convince him  09:11:36
21   to work with NetMarket and put his music CD catalog
22   on the Internet.
23        Q.  What do you mean by a business plan?
24        A.  This was specifically the proposal, and
25   then we followed up with him with the exact terms of   09:11:50
```

31

1    or web-based user interface, and how a Noteworthy
 2    customer, or proposed customer, would walk through
 3    and use the service.
 4         Q.   Okay.  The first line of Appendix B says,
 5    "The following pages show what a typical customer          09:14:42
 6    would see."
 7         Can you identify what those following
 8    pages are?
 9         A.   Yes.  They are a series of graphics that,
10    again, I found on my hard drive from that time, that       09:14:51
11    we developed specifically to show off the proposed
12    service that we had in mind.
13         Q.   Okay.  How were these images generated?
14         A.   So, I'm fairly certain of the fact that
15    they weren't generated the way our eventually site         09:15:12
16    generated them.  That is, these are not the actual
17    database sitting behind, with the transaction system
18    with all the other pieces, producing these sites
19    dynamically.
20         Instead, we simply wrote the HTML to make             09:15:25
21    the site look the way it would to a user once the
22    real site was completed.  That is, they're very much
23    demo pages, not the real screen shots of the real
24    final user interface.
25         I mean, you can see, in the document URL,             09:15:53

1  that the word "test" is in there, which doesn't prove
2  anything, but I believe that that indicates that
3  these are demo pages.
4       Q.  Were these HTML demo pages, were they
5  accessed using a browser?                              09:16:11
6       A.  Yes.  So I believe that we created these
7  pages, and then you can see that we actually accessed
8  them on Swarthmore's computers -- which is, perhaps,
9  not the most professional thing to do in a
10 proposal -- but then the web browser, X Mosaic in      09:16:26
11 this case, renders of the pages we created to make
12 them look in this fashion.  Then we took a screen
13 shot, or multiple screen shots, of that X Mosaic
14 browser.
15      Q.  Why does the URL line state "swarthmore"?     09:16:40
16      A.  Because we were at Swarthmore and using
17 its computer systems while we were developing.
18      Q.  Just to be clear, why were you at
19 Swarthmore?
20      A.  I was an undergraduate student at the         09:16:55
21 time.
22      Q.  Okay.
23      A.  Interesting to note the travel piece is
24 still on there at that point.
25      Q.  Can you turn to the first page?  You can      09:17:14

```
 1      Q.  Do you recall what product line was next
 2  added?
 3      A.  I don't, off the top of my head.
 4      Q.  Have you heard of a company called
 5  Newberry Comics?                                        10:44:41
 6      A.  I have.
 7      Q.  Did Newberry Comics ever have any
 8  relationship with NetMarket?
 9      A.  I believe we did, yes.
10      Q.  What was that relationship?                     10:44:49
11      A.  I believe we added their information onto
12  the website.
13      Q.  When you say you added their information,
14  what do you mean?
15      A.  Created a store for them as well.               10:44:59
16      Q.  Would the Newberry site have used the
17  NetMarket technology for its products?
18      A.  It would have.  It would have used all the
19  same functionality to add it on, because that would
20  have been by far the easiest, cheapest thing for us     10:45:14
21  to do.
22      Q.  Can you tell me what happened to NetMarket
23  as a company later in '94?
24      A.  Yes.  I believe, in December of '94, we
25  sold NetMarket to what was then CUC International,      10:45:27
```

1  which was a very large multi-billion-dollar direct
2  mail and services company.
3       Q.  How did that transaction come about?
4       A.  We had obviously gotten an enormous amount
5  of interest and attention from starting the company,      10:45:48
6  and began talking about strategic relationships with
7  several different firms.  We were -- CUC seemed like
8  a good fit, in terms of having a large number of
9  products, a large customer base, and would be
10 interested in moving onto the Internet in order to        10:46:08
11 improve the value of that functionality, in order to
12 reach new customers, et cetera; and so we agreed to
13 sell the company but remain an independent subsidiary
14 of them.
15           MR. CARRAWAY:  Mark this, please.              10:46:32
16           (Deposition Exhibit No. 23 was marked
17           for identification.)
18 BY MR. CARRAWAY:
19      Q.  Can you identify Exhibit 23 for me?
20      A.  I can.  This is the bill of sale selling        10:47:02
21 to CUC.  I see that the actual date was November 8th,
22 '94; not December.
23      Q.  Does your signature appear anywhere on
24 this document?
25      A.  Yes, it does.  I am -- I believe I'm the        10:47:13

1          (The deposition of DANIEL M. KOHN
                2       was reconvened at 12:47 p.m.)
                3
                4              DANIEL M. KOHN,
                5    having been previously duly sworn, testified further
                6    as follows:
                7
                8          THE VIDEOGRAPHER: We're back on the
                9    record. The time is 12:47 p.m.
               10                                                          12:47:00
               11              CROSS-EXAMINATION
               12    BY MR. GIANNETTI:
               13       Q. Mr. Kohn, I just wanted to remind you that
               14    you're still under oath. Do you appreciate that?
               15       A. Yes, I do.                                      12:47:11
               16       Q. Okay. Now, I want to ask you about some
               17    of your direct testimony that Mr. Carraway conducted.
               18          Is it correct that you don't have any
               19    pictures of how the website, the NetMarket website,
               20    actually appeared?                                    12:47:25
               21       A. Yes, that's correct. I only have the
               22    pictures of an earlier demo of the website, not the
               23    actual production website.
               24       Q. Correct. So you don't have any pictures
               25    of what the website looked like for some of these    12:47:37

```
 1   tests that you testified about in March or April or
 2   July; correct?
 3       A.  Yes; that's correct.
 4       Q.  And you don't even have pictures of what
 5   you've talked about as the commercial rollout in        12:47:47
 6   August of '94, do you?
 7       A.  Correct.
 8       Q.  You don't have any laboratory notebooks,
 9   either, kept by people in your organization?
10       A.  We didn't use laboratory notebooks.            12:48:01
11       Q.  Right.  Yours was not the kind of
12   organization that kept careful records of its
13   activity, was it?
14       A.  I would not agree with that statement.
15       Q.  Okay.  So you don't have any notebooks;        12:48:12
16   correct?
17       A.  Correct.
18       Q.  You don't have any pictures of how the
19   website looked?
20       A.  Correct.                                       12:48:17
21       Q.  You don't have any development records?
22       A.  The development records we had were the
23   software that was developed.  I believe we used
24   version control in developing it, and we had a large
25   number of e-mails debating and describing the process  12:48:31
```

133

```
1   during development.
2              In the eleven years since then, I've
3   misplaced my e-mails about it, and I'm not aware if
4   Cendant has been able to locate the software that has
5   been sold to them.                                    12:48:48
6        Q.  So you do not have these e-mails --
7        A.  I do not.  I have not been able to locate
8   the backup tape that I have.
9        Q.  And it's your understanding that people
10  have been out looking for e-mails relating to this    12:48:54
11  NetMarket activity; is that right?
12       A.  I'm not aware, one way or the other.
13       Q.  Well, haven't you seen some e-mails from
14  Mr. Smith, and others, talking about e-mails that
15  they're collecting for Mr. Carraway?                  12:49:07
16       A.  I've seen an e-mail that they collected,
17  that they forwarded to me.
18       Q.  So you're aware that there has been an
19  effort going on to try to collect historical
20  documents in connection with your NetMarket --        12:49:21
21       A.  Some effort.  I'm not aware of the details
22  of it.
23       Q.  All right.  Well, you've been asked
24  about --
25       A.  Yes.  I was subpoenaed.                      12:49:23
```

134

1     Q.  You were subpoenaed; but, also, you were
2   asked, prior to receiving the subpoena, for any
3   documents that you had.
4     A.  I guess so, yes.
5     Q.  So far, you haven't seen any of the                12:49:31
6   software that was really the basis for the website,
7   have you?
8     A.  No, I have not.
9     Q.  And wouldn't you say that the software is
10  really the best indicator of how the system operated, 12:49:41
11  and not your memory?
12          MR. CARRAWAY:  Objection to form.
13          THE WITNESS:  The software was the system.
14  BY MR. GIANNETTI:
15    Q.  Correct.  So that would be the best record       12:49:52
16  of what the system was?
17    A.  Yes, it would.
18          MR. CARRAWAY:  Objection.
19  BY MR. GIANNETTI:
20    Q.  A better record than your recollection of        12:49:57
21  it; correct?
22    A.  Yes, it would be.
23    Q.  Now, you testified about a number of
24  newspaper articles; is that right?
25    A.  Yes, I did.                                       12:50:06

135

commercial transaction on the World Wide Web; is that right?

A. Yes.

Q. So The New York Times article didn't quite get it right about your organization, did it?         12:52:03

MR. CARRAWAY: Objection to form.

THE WITNESS: I'd say it largely did.

BY MR. GIANNETTI:

Q. Well, let's take a look at the article. Let me get the exhibit number.         12:52:30

MR. CARRAWAY: It's 2.

BY MR. GIANNETTI:

Q. It's 2.

A. Are we going to be going through a lot of these? These are out of order. So if we're going to         12:52:59
be going through a lot of them, I will re-sort them.

Q. I don't think we're going to be using very many of them. I apologize.

A. That's fine. It's just that I don't have it yet.         12:53:13

Q. There we go.

A. Here it is.

Q. Okay. So, in The New York Time article, I'm referring, now, to the first column, Mr. Lewis says, "A team of young cyberspace entrepreneurs         12:53:20

138

1   celebrated what was apparently the first retail
2   transaction on the Internet using a readily available
3   version of powerful data encryption software designed
4   to guarantee privacy."
5           That was really BiblioBytes, wasn't it?          12:53:38
6       A.  I've since learned that I believe
7   BiblioBytes conducted a secure transaction before us;
8   but I would say, if you looked at the larger import
9   of the article, "Attention Shoppers: Internet is
10  Open," it was the combination of a graphical, easily   12:53:52
11  used web browser with encryption that was the
12  exciting news.
13      Q.  Now, we talked about the lack of
14  laboratory notebooks or pictures of this website.
15  You don't have a patent on your technology, either,    12:54:08
16  do you?
17      A.  No, we do not.
18      Q.  You never filed a patent application on
19  any of this work that you did at NetMarket?
20      A.  No, we didn't.                                 12:54:18
21      Q.  You've subsequently filed a patent
22  application.
23      A.  Yes, I have.
24      Q.  But, at the time, you had a lawyer for the
25  company; right?                                        12:54:24

EASTWOOD-STEIN DEPOSITION SERVICES
(800) 219-5300

Q. Was it your policy at NetMarket to try to publicize your accomplishments?

A. Yes, it was.

Q. Do you think you succeeded at that?

A. Fairly well.                                    12:55:42

Q. From a financial standpoint, NetMarket wasn't very successful, was it?

A. I don't think I would agree with that.

Q. Well, we looked at a document this afternoon, which, I think, showed $7500 in revenue   12:55:54
for a one-year period?

A. Uh-huh.

Q. Is that right?

A. I believe that was the number.

Q. I mean, if you would like to take a look    12:56:05
at the document, I can show it to you. It looks like you have it.

A. No. It's not this one.

Q. It's Exhibit 28.

A. So, I believe this indicates that over      12:56:42
approximately a year, we had $7500 of revenue.

Q. And that was from your Noteworthy business?

A. Yes.

Q. That was your biggest client; correct?      12:56:52

141

1    Q. You ended up selling -- you think that you
2    could get venture capitalists to invest in your
3    company when you were showing revenues of $7500 a
4    year?
5    A. Absolutely. I would say, as a venture        12:58:10
6    capitalist, almost all of the companies that I've
7    funded had zero revenue when we funded it.
8    Q. Do you think your prospects of getting
9    venture capital financing would have improved if you
10   had some patent applications?                       12:58:21
11   A. Probably so.
12   Q. And, in fact, when you sold your company,
13   were you satisfied with the money that you got from
14   CUC?
15   A. The agreement we made with CUC was an        12:58:29
16   earnout agreement based on the revenues we were going
17   to generate over the next couple of years. So it was
18   a highly contingent agreement.
19   Q. Right. It was contingent on your sales,
20   because the cash component of that agreement was     12:58:48
21   rather low, wasn't it?
22   A. Yes, it was.
23   Q. The cash component was $235,000,
24   approximately?
25   A. Approximately.                               12:58:58

```
 1        Q.   And that was cash that was shared among
 2   you and your partners?
 3        A.   Yes.
 4        Q.   How much was your share of that $235,000?
 5        A.   I don't recall.                              12:59:11
 6        Q.   About a quarter?
 7        A.   No.  It was somewhat less than a quarter,
 8   because we had to pay back our angel money as well.
 9        Q.   So you got $235,000 in cash for your
10   company, of which you had to pay back your initial    12:59:23
11   financing of, what was it, $40,000?
12        A.   Approximately.
13        Q.   And then, out of the balance, you and your
14   three partners shared the proceeds?
15        A.   Yes.                                         12:59:36
16        Q.   And that was for what, a year and a half's
17   worth of work?
18        A.   That's not an correct summary of what we
19   were paid.  The agreement was an earnout agreement.
20        Q.   Okay.  But in terms of cash, that's what    12:59:44
21   you took away from the agreement.
22        A.   No.  In terms of the up-front cash
23   payment, that's what we took away from the agreement.
24        Q.   Do you think that payment would have been
25   higher if you had had some patent applications?       12:59:49
```

MR. CARRAWAY:  Objection.  Form.
BY MR. GIANNETTI:
        Q.  Well, he says, "We could stick with long
URLs..."  Doesn't that suggest that that's what was
implemented?                                              13:11:23
            MR. CARRAWAY:  Objection.
            THE WITNESS:  No.  That says that we could
stick with long URLs.  The fact that we previously
mentioned process ID implies that we've also
implemented the other system, and that this is a          13:11:32
window on the debate on which of the systems, or some
variety, we should use.
BY MR. GIANNETTI:
        Q.  Can you give me the precise date on which
the session ID, which you've referred to as the           13:11:40
session ID with the number, the identifier in the
URL, was implemented?
        A.  I cannot give the precise date, but I can
look and say that I'm certain we did it before we
went live online, and I believe we did it much           13:11:55
earlier.
        Q.  And, again, this is something that you're
relying on your memory for; is that right?
        A.  No.  Also this information to aid my
recollection.  So several of these letters, the fact     13:12:05

                                                              155

1  that we specifically talk about the session ID.
2  Also, particularly the letter to the flower guy.
3      Q.  Do you have a piece of software that shows
4  it?
5      A.  I do not.                                    13:12:21
6      Q.  Do you have a laboratory notebook that
7  shows it?
8      A.  I believe I answered that question
9  already.
10     Q.  Do you have an e-mail to one of your          13:12:27
11 programmers that says, "This is how we're going to
12 implement the session ID.  Do it"?
13     A.  As I indicated, I cannot find the tape
14 with my backup e-mails.
15     Q.  All right.  Now, you had a problem with      13:12:39
16 the session ID, in that it changed each time a person
17 closed their browser and reopened it; right?
18     A.  I'm not sure I'd see that as a problem.
19     Q.  You've used the Amazon website; correct?
20     A.  Yes, I have.                                 13:13:00
21     Q.  And you realize that when you go back to
22 the website after using it, you get your shopping
23 cart again; right?
24     A.  It so happens that that functionality only
25 is enabled if you turn on cookies.  So if you don't  13:13:10

1   I'm wrong, that it bothered you -- that you wanted to
         2   set the record straight.  It bothered you that the
         3   patents are valid?
         4        A.   I don't believe I said that.
         5        Q.   So it doesn't really bother you about the        13:19:20
         6   Open Market patents?  You don't have any concern
         7   about them?
         8             MR. CARRAWAY:  Objection to form.
         9             THE WITNESS:  It annoys me that
        10   Open Market claims to have done something first that       13:19:28
        11   I believe we did first.
        12   BY MR. GIANNETTI:
        13        Q.   And you actually posted something on a
        14   bulletin board to that effect; right?
        15        A.   Yes, I did.                                      13:19:39
        16        Q.   That's Exhibit 7 that you have in front of
        17   you.
        18        A.   Yes.
        19        Q.   Okay.  You said, "Patenting stuff this
        20   obvious is just pathetic."  Is that what you said?         13:19:58
        21        A.   That's what I said on the posting.
        22        Q.   You posted that in 1998?
        23        A.   Yes.
        24        Q.   And the record will show what you said,
        25   but my recollection is that you did say something          13:20:09

```
 1           You still haven't reviewed those patents;
 2   right?
 3        A.  That is correct.
 4        Q.  So, as you come here today, with your
 5   statements about the patents, you really haven't          13:21:16
 6   reviewed them.  You haven't studied them; right?
 7        A.  That is correct.  I might add that I'm
 8   here today because I was subpoenaed.
 9        Q.  Yes, that's true.  You were subpoenaed by
10   both sides.  But up until now, have you had any           13:21:25
11   communications with any of the Amazon lawyers about
12   the patents and about the lawsuit?
13        A.  As I said yesterday, I've had some
14   telephone calls in the last week or two.
15        Q.  It's clear which side of this lawsuit            13:21:36
16   you're on, isn't it?  You would like to see these
17   patents invalidated?
18        MR. CARRAWAY:  Objection to form.
19        THE WITNESS:  I would say that I don't
20   have any interest in the lawsuit on its own.  It          13:21:46
21   bothers me, as a statement of fact, to have this
22   company out there claiming to do something first that
23   I don't believe they did first.
24   BY MR. GIANNETTI:
25        Q.  And is part of that the fact that you            13:21:54
```